PER CURIAM:
Ellisa Martinez appeals her conviction under 18 U.S.C. § 875(c) for knowingly-transmitting a threatening communication. We affirm.
I. FACTS AND PROCEDURAL HISTORY
On November 10, 2010, talk-show host Joyce Kaufman at WFTL radio received an anonymous email form-response stating:
Dear Ms. Kaufman I was so thrilled to see you speak in person for congressman elect west. I was especially exited [sic] to hear you encourage us to exercise our second amendment gun rights. I felt your plan to organize people with guns in the hills of Kentucky and else where was a great idea. I know that you know one election is not enough to take our country back from the illegal aliens, jews, muslims, and illuminati who are running the show. I am so glad you support people who think like me. i’m planning something big around a government building here in Broward County, maybe a post office, maybe even a school, I’m going to walk in and teach all the government hacks working there what the 2nd amendment is all about. Can I count on your help? you and those people you know in Kentucky? we’ll end this year of 2010 in a blaze of glory- for sure, thanks for your support mrs kauf-man. what does sarah say, don’t retreat, reload! let’s make headlines girl!
Several hours after this email was sent, an anonymous woman called WFTL. She told station officials that her husband had sent the prior email, that he was mentally ill, and that he was now planning to open fire at a nearby school. The anonymous woman implored the station to broadcast a plea asking her husband not to carry out the shooting.
These communications prompted the Pembroke Pines Police Department to institute a “Code Red” lockdown on all Bro-ward County schools. The Police Department also shutdown several other public buildings, requiring officers to work overtime securing the facilities. Ultimately, however, no shooting occurred and the anonymous woman sent no further communications.
Soon after these events, investigators discovered that both anonymous communications were sent by the same person: Ellisa Martinez. Initially, Martinez denied any involvement in or knowledge of the incident. However, once a grand jury indicted her for making a true threat in violation of 18 U.S.C. § 875(c), and once the district court denied her motion to dismiss the indictment, Martinez pleaded guilty.
In pleading guilty, Martinez reserved the right to appeal the denial of her motion to dismiss the indictment on the following issues: (1) whether the indictment was insufficient because it did not allege Martinez subjectively intended to convey a threat to injure others; and (2) whether § 875(c) was unconstitutionally overbroad because it did not require the Government to prove the speaker subjectively intended *984 her statements to constitute a threat. Concurrent with her guilty plea, Martinez and the Government executed and filed a factual stipulation. That stipulation recounted the legal elements of an offense under § 875(c) and detailed the factual basis of Martinez’s crime. Martinez conceded that she knowingly and willfully sent the November 10th email, and that “the email contained language that an objectively reasonable jury could find beyond a reasonable doubt to be a serious expression of an intent to injure another person.” At her change-of-plea hearing, Martinez acknowledged she understood the plea agreement, and the Government rhad the parties’ factual stipulation'aloud in court.
After the district court accepted Martinez’s guilty plea,, the court ultimately ordered Martinez to pay the Police Department $5,350.89 in restitution for the costs incurred securing and safeguarding the schools and students in Broward County, Florida, as a result of her offense. Martinez appealed.
II. THE FIRST AMENDMENT AND TRUE THREATS
Pursuant to her conditional guilty plea, Martinez brings two constitutional challenges under the First Amendment. First, Martinez contends her indictment was constitutionally deficient under Virginia v. Black, 538 U.S. 343, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003), because it did not allege she subjectively intended to convey a threat to injure others. Second, Martinez argues that, if § 875(c) does not require subjective intent, the statute is unconstitutionally overbroad.[1]

A. True Threats and Intent

While the First Amendment generally prohibits the Government from restricting speech based on its message or viewpoint, Ashcroft v. ACLU, 535 U.S. 564, 573, 122 S.Ct. 1700, 1707, 152 L.Ed.2d 771 (2002), the First Amendment’s free-speech protections are not absolute, see Chaplinsky v. New Hampshire, 315 U.S. 568, 571, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942). In certain narrowly drawn categories, the Government may permissibly restrict speech on the basis of content. United States v. Stevens, 559 U.S. 460, 130 S.Ct. 1577, 1584, 176 L.Ed.2d 435 (2010). These categories of unprotected speech do not require case-by-case balancing because the harms they impose “so overwhelmingly outweigh[]” any First Amendment concerns that the “balance of competing interests is clearly struck.” New York v. Ferber, 458 U.S. 747, 763-64, 102 S.Ct. 3348, 3358, 73 L.Ed.2d 1113 (1982).
“True threats” are one such category of unprotected speech. United States v. Alvarez, — U.S.-, 132 S.Ct. 2537, 2544, 183 L.Ed.2d 574 (2012) (plurality opinion). Although statutes penalizing speech “must be interpreted with the commands of the First Amendment clearly in mind,” Watts v. United States, 394 U.S. 705, 707, 89 S.Ct. 1399, 1401, 22 L.Ed.2d 664 (1969), objective threats of violence contribute nothing to public discourse and enjoy no First Amendment protection, see R.A.V. v. City of St. Paul, 505 U.S. 377, 382-83, 112 S.Ct. 2538, 2542-43, 120 L.Ed.2d 305 (1992). The critical issue for the true threats doctrine is distinguishing true threats from mere political hyperbole; while the former are outside the First Amendment, the latter is entitled to full *985 constitutional protection. See Watts, 394 U.S. at 707-08, 89 S.Ct. at 1401-02.
Martinez argues that the Supreme Court’s decision in Virginia v. Black draws the distinction between true threats and protected speech based on the speaker’s subjective intent. Relying on Ninth Circuit precedent, Martinez contends Black redefined true threats to require proof the speaker subjéctively intended to threaten listeners. See United States v. Bagdasari-an, 652 F.3d 1113, 1116 (9th Cir.2011) (holding that a threat — even one “objective observers would reasonably perceive ... as a threat of injury or death” — cannot be prosecuted unless the speaker subjectively intended the speech to be a threat). Therefore, Martinez claims, her indictment was constitutionally insufficient because it did not allege she acted with the subjective intent to threaten.

1. Origins of the True Threats Doctrine

The true threats doctrine took shape in Watts v. United States. See 394 U.S. at 705-08, 89 S.Ct. at 1399-1402. In Watts, the Supreme Court reversed the conviction of a man charged with knowingly and willfully threatening the President under 18 U.S.C. § 871(a), based on the following statements:
They always holler at us to get an education. And now I have already received my draft classification as 1-A and I have got to report for my physical this Monday coming. I am not going. If they ever make me carry a rifle the first man I want to get in my sights is L.B.J. They are not going to make me kill my black brothers.
Id. at 705-06, 89 S.Ct. at 1400-01 (internal quotation marks omitted).
Although the Court acknowledged that true threats were not protected expression, the Court ’nonetheless held that Watts’s statements were mere “political hyperbole.” Id. at 707-08, 89 S.Ct. at 1401. When taken in context, the Court could not see how Watts’s statements could be interpreted as anything other than “a kind of very crude offensive method of stating a political opposition to the President.” Id. at 708, 89 S.Ct. at 1402 (internal quotation marks omitted).
Importantly, the Court reached this conclusion based on the objective characteristics of the speech and the context in which it was delivered — the Court did not speculate as to the speaker’s subjective mental state. See id. For example, the Court looked to where the statement was made: in public during a group political debate. Id. Additionally, the Court looked to the nature of the statement: it was expressly conditional upon Watts’s conscription into the military — an event he vowed would never occur. Id. at 707-08, 89 S.Ct. at 1401-02. Finally, the Court looked to the reaction of those in attendance: listeners as well as the speaker “laughed after the statement was made.” Id.
Following Waits, most federal courts of appeals defined true threats according to an objective standard. See Doe v. Pulaski Cnty. Special Sch. Dist., 306 F.3d 616, 622 (8th Cir.2002) (en banc) (noting that, while some courts applied a reasonable-speaker standard and others a reasonable-listener standard, “[a]ll the courts to have reached the issue ... consistently adopted an objective test” for true threats). Between Watts in 1969 and Black in 2003, this Court in particular consistently applied an objective, reasonable-person test when distinguishing true threats from protected speech. See United States v. Callahan, 702 F.2d 964, 965 (11th Cir.1983); United States v. Bozeman, 495 F.2d 508, 510 (5th *986 Cir.1974).[2] Under that objective standard, a true threat is a communication that, when taken in context, “would have a reasonable tendency to create apprehension that its originator will act according to its tenor.” United States v. Alaboud, 347 F.3d 1293, 1296-97 (11th Cir.2003) (internal quotation marks omitted).
2. Virginia v. Black and True Threats
Despite this history and precedent, Martinez contends Black altered the Watts framework for true threats and tacitly overruled our case law defining true threats according to an objective standard. However, four circuits to address the issue have declined to adopt Martinez’s reading of that decision. See United States v. Elonis, 730 F.3d 321, 332 (3d Cir.2013) (“[W]e find that Black does not alter our precedent.”); United States v. Nicklas, 713 F.3d 435, 440 (8th Cir.2013) (joining the majority of circuits which have held that, in the wake of Black, § 875(c) does not require the Government to prove a defendant specifically intended his or her statements to be threatening); United States v. Jeffries, 692 F.3d 473, 479 (6th Cir.2012); United States v. White, 670 F.3d 498, 508 (4th Cir.2012) (“A careful reading of the requirements of § 875(c), together with the definition from Black, does not, in our opinion, lead to the conclusion that Black introduced a specific-intent-to-threaten requirement into § 875(c) and thus overruled our circuit’s jurisprudence, as well as the jurisprudence of most other circuits, which find § 875(c) to be a general intent crime and therefore require application of an objective test in determining whether a- true threat was transmitted.”). But see United States v. Cassel, 408 F.3d 622, 633 (9th Cir.2005) (holding that Black requires a subjective-intent analysis).
We agree with the Sixth Circuit that Black did not work a “sea change,” tacitly overruling decades of case law by importing a requirement of subjective intent into all threat-prohibiting statutes. Jeffries, 692 F.3d at 479; see also Elonis, 730 F.3d at 332 (“Black does not clearly overturn the objective test the majority of circuits applied to § 875(c).”).
In Black, the Supreme Court addressed a state statute making it a crime to burn a cross with the “intent of intimidating any person or group.” See 538 U.S. at 347-48, 123 S.Ct. at 1541 (internal quotation marks omitted). Although the Court divided in its rationale, a majority of the Court reaffirmed the basic holding of Watts and other cases that true threats are not protected under the First Amendment. See id. at 358-60, 123 S.Ct. at 1547-48. The Court defined true threats as “those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals.” Id. at 359, 123 S.Ct. at 1548. According to a plurality of the Court, because the statute made the act of cross burning prima facie evidence of intent to intimidate, it effectively rendered cross burning a strict-liability offense. See id. at 365, 123 S.Ct. at 1550-51 (plurality opinion). And, without any mens rea requirement, the statute covered more than just true threats and “create[d] an unacceptable risk of the suppression of ideas.” Id. (internal quotation marks omitted).
Contrary to Martinez’s argument, Black did not import a subjective-intent analysis into the true threats doctrine. Rather, Black was primarily a case about the over- *987 breadth of a specific statute — not whether all threats are determined by a subjective or objective analysis in the abstract. See Jeffries, 692 F.3d at 479-80 (observing that Black “says nothing about imposing a subjective standard on other threat-prohibiting statutes, and indeed had no occasion to do 'so: the Virginia law itself required subjective ‘intent.’ The problem in Black thus did not turn on subjective versus objective standards for construing threats. It turned on overbreadth — that the statute lacked any standard at all”). When interpreting a statute like § 875(c), which articulates no explicit mens rea requirement and is therefore treated as a general-intent crime, see United States v. Duran, 596 F.3d 1283, 1292 (11th Cir.2010), Black leaves our analysis and objective standard unaltered.
Black’s definition of true threats is fully consistent with a general-intent standard examining only the objective characteristics of the speech act. See White, 670 F.3d at 509. General-intent crimes require only that the defendant actually intend to perform the prohibited act; she need not subjectively intend the precise purpose or results of the crime. Id. at 508; see also Carter v. United States, 530 U.S. 255, 268, 120 S.Ct. 2159, 2168, 147 L.Ed.2d 203 (2000). Similarly, Black defined true threats as those statements a speaker means to communicate — i.e., knowingly communicate — that contain a serious expression of violent intent. See Black, 538 U.S. at 359, 123 S.Ct. at 1548 (majority opinion). However, the speaker need not subjectively intend her statement to be a threat, in much the same way she need not subjectively intend to violate the law or “actually intend to carry out the threat.”[3] See id.
The Supreme Court’s definition of intimidation buttresses our interpretation of true threats. Black defined “intimidation” as a “type of true threat” directed with the intent — i.e., the specific, subjective intent — to place listeners in fear of bodily harm or death. See id. at 360, 123 S.Ct. at 1548. By defining intimidation to include a subjective-intent analysis, Black indicated that the general class of true threats does not require such an inquiry into the speaker’s subjective mental state. After all, intimidation is but one type of true threat — a true threat delivered with a particular, subjectively held intent. See id. (suggesting speech qualifies as intimidation when it is “intended to create a pervasive fear in victims that they are a target of violence” (emphasis added)). But explicitly requiring subjective intent for one discrete type of ’ true threat makes little sense if thé Court intended all true threats to require such intent.
Finally, we find the Third Circuit’s recent opinion in Elonis persuasive. In rejecting the same reading of Black that Martinez urges on us, the Third Circuit clearly and precisely explained why that decision did not alter the well-established understanding of the true threats doctrine. See Elonis, 730 F.3.d at 327-32. Particularly noteworthy is the Third Circuit’s .insight that “[ljimiting the definition of true *988 threats to only those statements where the speaker subjectively intended to threaten would fail to protect individuals from the fear of violence and the disruption that fear engenders, because it would protect speech that a reasonable speaker would understand to be threatening.” Id. at 380 (internal quotation marks omitted).
Accordingly, we hold that Black does not require a subjective-intent analysis for all true threats. Id. at 332 (“Black does not say that the true threats exception requires a subjective intent to threaten”). Knowingly transmitting the threat makes the act criminal — not the specific intent to carry it out or the specific intent to cause fear in another. United States v. Fuller, 387 F.3d 643, 646 (7th Cir.2004) (citing United States v. Kelner, 534 F.2d 1020, 1025 (2d Cir.1976)). Therefore, when the Government shows that “a reasonable person would perceive the threat as real,” a true threat may be punished and “any concern about the risk of unduly chilling protected speech has been answered.” Jeffries, 692 F.3d at 478.

B. Overbreadth and § 875(c)

Next, Martinez argues that if subjective intent is not required for prosecution under § 875(c), the statute is unconstitutionally overbroad. Under the First Amendment, a statute is overbroad if “a substantial number of its applications are unconstitutional, judged in relation to the statute’s plainly legitimate sweep.” Stevens, 130 S.Ct. at 1587 (internal quotation marks omitted). In making this determination, we first construe the statute so that its meaning is clear. United States v. Williams, 553 U.S. 285, 293, 128 S.Ct. 1830, 1838, 170 L.Ed.2d 650 (2008). We then determine whether the statute, as construed, “criminalizes a substantial amount of protected expressive activity.” Id. at 297, 128 S.Ct. at 1841.
■After conducting this analysis, we conclude Martinez’s overbreadth claim is mer-itless. In its entirety, § 875(c) provides:
Whoever transmits in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another, shall be fined under this title or imprisoned not more than five years, or both.
18 U.S.C. § 875(c).
The actus reus of the statute is transmitting a threat — that is, a true threat. See White, 670 F.3d at 508. A true threat is determined from the position of an objective, reasonable person, see Alaboud, 347 F.3d at 1296-97, unless a particular offense involves “intimidation,” see Black, 538 U.S. at 359-60, 123 S.Ct. at 1548. Section 875(c), however, is silent as to mens rea, requiring neither an intent to place the .victim in fear of bodily harm or death, nor any other showing of specific intent. See United States v. Francis, 164 F.3d 120, 122 (2d Cir.1999) (“There is nothing in the language or legislative history of Section 875(c) suggesting that Congress intended it to be a specific-intent crime.”).
As a result, § 875(c) is a general-intent offense that requires the Government to show (1) the defendant transmitted a 'communication in interstate or foreign commerce, (2) the defendant transmitted that communication knowingly, and (3) the communication would be construed by a reasonable person as a serious expression of an intent to inflict bodily harm or death. Cf. Callahan, 702 F.2d at 965. Section 875(c) “does not require the government to prove a defendant specifically intended his or her statements to be threatening.” Nicklas, 713 F.3d at 440.
*989 Construed this way, § 875(c) does not sweep up a “substantial amount of protected expressive activity.” See Williams, 553 U.S. at 297, 128 S.Ct. at 1841. To the contrary, because we construe the statute as applying to true threats — and only true threats— § 875(c) on its face criminalizes no protected expressive activity. After all, true threats fall “outside the First Amendment,” R.A.V., 505 U.S. at 388, 112 S.Ct. at 2546, since they are “so intertwined with violent action that” they “essentially become conduct rather than speech,” Francis, 164 F.3d at 123, inflicting injury on the listener “ ‘by their very utterance,’ ” Jeffries, 692 F.3d at 480 (quoting Chaplinsky, 315 U.S. at 572, 62 S.Ct. at 769).[4]
Thus, unlike the statute in Black, § 875(c) does not permit a jury to convict any time “defendants exercise their constitutional right not to put on a defense,” nor does it permit the Government “to arrest, prosecute, and convict a person based solely on” protected expression. See 538 U.S. at 365, 123 S.Ct. at 1550-51 (plurality opinion). While cross burning can receive protection under the First Amendment in certain instances, see id. at 366, 123 S.Ct. at 1551, true threats, however communicated, are categorically not protected under the First Amendment, see Madsen v. Women’s Health Ctr., Inc., 512 U.S. 753, 773, 114 S.Ct. 2516, 2529, 129 L.Ed.2d 593 (1994). Accordingly, § 875(c) does not chill constitutionally protected speech, because § 875(c) On its face does not permit the Government to “prosecute — and potentially convich — somebody engaging only in lawful political speech at the core of what the First Amendment is designed to protect.” Black, 538 U.S. at 365, 123 S.Ct. at 1551.
Martinez’s argument that § 875(c) allows for the prosecution of a would-be Good Samaritan who mistakenly shouts “fire!” in a crowded theater fails for numerous reasons, not the least of which is that one imaginative hypothetical does not justify applying the “strong medicine” of the overbreadth doctrine. See Broadrick v. Oklahoma, 413 U.S. 601, 613, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973). Like any other law, § 875(c) is not overbroad simply because litigants “cán hypothesize some deterrent effect on protected speech.” See Shackelford v. Shirley, 948 F.2d 935, 940 (5th Cir.1991). Because invalidating § 875(c) on overbreadth grounds is a “last resort,” see Broadrick, 413 U.S. at 613, 93 S.Ct. at 2916, we must, when possible, “construe the statute to avoid constitutional problems,” Ferber, 458 U.S. at 769 n. 24, 102 S.Ct. at 3361 n. 24.
In this case, we have construed § 875(c) in a manner that does not raise constitutional concerns. Because true threats are unprotected speech, and because our reading of § 875(c) limits that statute to true threats, Martinez has not demonstrated a “realistic danger” that § 875(c) will “significantly compromise recognized First Amendment protections.” Members of City Council of City of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 801, 104 S.Ct. 2118, 2126-27, 80 L.Ed.2d 772 (1984). Accordingly, we uphold the statute *990 in the face of Martinez’s overbreadth claim.[5]
III. CONCLUSION
For the foregoing reasons, Martinez’s conviction and the district court’s order of restitution are AFFIRMED.

. We review constitutional challenges de novo. United States v. Acuna-Reyna, 677 F.3d 1282, 1284 (11th Cir.2012).

. In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

. Moreover, objective standards are not unusual in the free-speech context. See, e.g., White, 670 F.3d at 511; see also FEC v. Wis. Right to Life, Inc., 551 U.S. 449, 468-69, 127 S.Ct. 2652, 2666, 168 L.Ed.2d 329 (2007) (refusing to base First Amendment doctrine on a speaker’s subjective motivation); NAACP v. Claiborne Hardware Co., 458 U.S. 886, 927-29, 102 S.Ct. 3409, 3433, 73 L.Ed.2d 1215 (1982) (analyzing the objective circumstances surrounding the speech to determine how it "might have been understood” by listeners); Norwell v. City of Cincinnati, 414 U.S. 14, 16, 94 S.Ct. 187, 188, 38 L.Ed.2d 170 (1973) (holding that a speaker's subjective motivation was not relevant to whether his speech qualified as "abusive language or fighting words”).

. Our construction of § 875(c) does not bar defendants from bringing as-applied challenges if prosecuted for speech that does not constitute a true threat. Cf. Broadrick v. Oklahoma, 413 U.S. 601, 615-16, 93 S.Ct. 2908, 2918, 37 L.Ed.2d 830 (1973). But Martinez has not brought an as-applied claim— and for good reason. In the factual stipulation supporting her plea agreement, Martinez admitted sending her threatening email "willfully,” which is to say, she "voluntarily and intelligently” made her threat with "an apparent determination to carry [it] out.” Pilking-ton, 583 F.2d at 747. Martinez has no claim that § 875(c) is unconstitutional as applied to her.

. We also affirm the district court’s partial denial of Martinez’s motion for reconsideration and its order imposing $5,350.89 in restitution. Not only did Martinez herself initially recommend $7,567.51 in restitution, but the court also did not clearly err when it found— based on Martinez’s factual stipulation — that her offense directly and proximately caused the Pembroke Pines Police Department's losses. See United States v. Robertson, 493 F.3d 1322, 1334 (11th Cir.2007). Moreover, contrary to Martinez’s assertions, the restitution order did not include investigatory and prose-cutorial costs. Rather, the court expressly limited restitution to the costs of securing schools in the wake of Martinez's offense.